**BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION**

v.

**HOTEL RITTENHOUSE ASSOCIATES, et al.**

Civ. A. No. 83–2809.

United States District Court, E.D. Pennsylvania.

Oct. 9, 1984.

Gregory M. Harvey, Thomas G. Wilkinson, Jr., Philadelphia, Pa., for plaintiff.

Charles V. Stoelker, Jr., Philadelphia, Pa., for the Partnership.

Harold E. Kohn, Philadelphia, Pa., for the Wolgins.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

In this action the Bank of America (the Bank) seeks to foreclose a mortgage on real estate located in the Rittenhouse square area of Philadelphia, known as the Hotel Rittenhouse Project, to recover on a promissory note and mortgage against Hotel Rittenhouse Associates (HRA), Jack L. Wolgin and Jack L. Wolgin Associates, general partners of HRA, and to recover against Jack L. Wolgin and Muriel Wolgin on a guarantee. The note, mortgage and guarantee were executed in connection with a construction loan for the Hotel Rittenhouse, a hotel-apartment-condominium project. The defendants have counterclaimed on a variety of grounds. The Bank has moved for summary judgment on these counterclaims which allege violations of the Bank Holding Company Act (Count VII), the federal securities laws (Count IX), and the Equal Credit Opportunity Act (Count XII). The Bank also requests partial sum-

mary judgment on Count VIII, which alleges a violation of the Racketeer Influenced and Corrupt Organizations Act.

For the reasons discussed below, the Bank's motion for summary judgment on Counts VII, IX, and XII will be granted and partial summary judgment will be granted on Count VIII.

■ A trial court may enter summary judgment if, after a review of all the evidentiary material in the record in a light most favorable to the party opposing the motion, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Hollinger v. Wagner Mining Equipment Co.*, 667 F.2d 402, 405 (3d Cir.1981). Where no reasonable resolution of the conflicting evidence and inferences therefrom could result in a judgment for the non-moving party, the moving party is entitled to summary judgment. *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 883 (3d Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

### The Bank Holding Company Act

In Count VII of their counterclaim, defendants assert that the Bank's engagement of an accounting firm at HRA's expense to perform an overpriced, incompetent audit of HRA's accounts for an improper purpose constituted an unusual banking practice and an illegal tying arrangement in violation of section 106(b) of the Bank Holding Company Act (BHCA), 12 U.S.C. § 1972 (1980). Section 1972 provides in relevant part:

A bank shall not in any manner extend credit ... on the condition ... that the customer shall ...

(A) obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service ... [or] (c) provide some additional credit, property, or service to such bank, other than those usually provided in connection with a loan ....

*Id.* Sections 1975 and 1976 authorize a private cause of action for treble damages and/or injunctive relief based on Section 1972. 12 U.S.C. §§ 1975–76 (1980).

■ The Third Circuit has explained that section 1972 does not prohibit all attempts by banks to use their economic power to protect their investments. *Tose v. First Pennsylvania Bank, N.A., supra.* Section 1972 prohibits only those " 'anticompetitive practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service they desire.' " *Id.*, (quoting S.Rep. No. 1084, 91st Cong., 2d Sess. 17, *reprinted* in [1970] U.S.Code Cong. & Ad. News, 5519, 5535). Merely establishing that a particular method of protecting against default is not commonly used is not sufficient to establish a violation of section 1972:

Unless the "unusual" banking practice is shown to be an anticompetitive tying arrangement which benefits the bank, it does not fall within the scope of the Act's prohibitions .... [where t]here is no evidence that the bank would benefit in any way other than by getting additional protection for its investment[, t]hat is not a tying arrangement.

*Parsons Steel v. First Alabama Bank of Montgomery*, 679 F.2d 242, 245–46 (11th Cir.1982) (bank's conditioning extension of credit on corporation's acceptance of a new manager, who would have the option of acquiring majority interest, not a violation of § 1972).

■ In this case, the Bank and HRA executed a construction loan agreement which required HRA to "[p]ermit Bank's employees or agents at any reasonable time ... to examine or audit [HRA's] books, accounts, and records ...." Amended Complaint, Exhibit B, ¶¶ 6.19–6.-20. The construction loan agreement further provides that HRA

shall pay upon demand all costs and expenses incurred in connection with Bank's consideration of whether to make the loan, ... and the ongoing analysis of the loan and monitoring the progress of construction and all problems and ques-

tions arising in relation thereto, including all fees and disbursements of all ... accountants ... and other experts retained by Bank to advise it, it being the intent of this provision to ensure that Bank shall not be obliged to pay for any expense incurred in connection with any of the matters referred to in or contemplated by this Agreement.

Amended Complaint, Exhibit B, ¶ 9.16. Defendants do not contend that the Bank's negotiation of these provisions evidences an unlawful tying arrangement. To do so would be futile, since these terms simply demonstrate the Bank's legitimate efforts to protect its investment. *See Tose, supra* (approving conditioning of credit on debtor's replacement of chief financial officer with bank's appointee). Rather, defendants assert that the manner in which the Bank purported to exercise its right to compel an audit constituted a violation of section 1972. However, resolving all factual disputes in defendants' favor, there is no violation of section 1972 of the BHCA.

The parties agree that by early 1982, the construction project was running behind schedule, and that HRA had requested extra advances and a restructuring of the loan agreement. At this point, the Bank's loan officer assigned to the HRA account authorized her subordinate to engage Berger & Epstein, an accounting firm, to investigate HRA's financial situation. Ratley affidavit, p. 2. Defendants contend that Berger & Epstein conducted an over-extensive and incompetent "compilation" which was intended to fabricate defaults against HRA and to support the Bank's position in future litigation. The evidentiary material produced by defendants, viewed in a light most favorable to the defendants (the non-moving parties), might be considered as supporting the following inferences: (a) that the Berger & Epstein audit was not conducted in accordance with generally accepted accounting standards; (b) that it was billed at twelve times the originally estimated fee; (c) that it was conducted in a manner which disrupted HRA's construction operation; and (d) that the Bank's loan officer had preconceived unfavorable no-

tions about HRA's financial picture and the internal operations of HRA which the loan officer expressed to Berger & Epstein when their services were engaged. However, even though these inferences might raise genuine issues of fact, none are material to a determination concerning a violation of section 1972.

As heretofore pointed out, section 1972 is concerned solely with anticompetitive tying arrangements. The inferences which defendants seek to prove fall short of showing that the Bank would benefit in any way other than by protecting its investment. It is possible that at trial the defendants may be able to prove some of the accountants' practices were tortious as to the defendants. But since the construction loan agreement provisions which authorize the Bank to require an audit at HRA's expense constitute legitimate bank practice, the inferences discussed above cannot serve as a basis for holding that the agreement was a prohibited tying arrangement under section 1972. *See B.C. Recreational Industries v. First National Bank,* 639 F.2d 828, 834 (1st Cir.1981) (requiring corporation to hire a financial advisor chosen by the bank constitutes legitimate banking practice; even when the advisor allegedly acted to protect the bank's security at the expense of the corporation's business interests).

For the reasons heretofore stated, summary judgment will be granted in favor of the Bank on Count VII of defendants' counterclaim.

### The Federal Securities Laws

In Count IX of their counterclaim, defendants allege that the Bank "made false and misleading statements and employed schemes and artifices to defraud" in violation of sections 12(2) and 17(a) of the 1933 Securities Act, 15 U.S.C. §§ 77*l* (2), 77q(a) (1980), and section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b) (1980) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (1978). Defendants assert that the promissory note delivered by HRA in connection with the construc-

tion loan (the Note), the Wolgins' personal guarantee (Continuing Guaranty), the HRA limited partnership agreement, "as well as certain other documents transferred to Bank of America by HRA and Wolgin in connection with the loan transaction" are "securities."

■ In considering the Bank's motion for summary judgment on these claims, this Court begins with the threshold question of whether any of the documents mentioned by defendants constitute "securities" within the meaning of the federal securities laws. *See Tcherepnin v. Knight,* 389 U.S. 332, 335–36, 88 S.Ct. 548, 552–53, 19 L.Ed.2d 564 (1967) (definitions of "security" in 1933 and 1934 Acts are "virtually identical"). The 1933 and 1934 acts provide that "unless the context otherwise requires . . . 'security' means any note . . . investment contract . . . or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in . . . or . . . guarantee of . . . any of the foregoing." 15 U.S.C. §§ 77b, 78c(a)(10) (1980).

Defendants assert that the promissory note evidencing the construction loan in this case is a security. Although the definition of security specifically includes "any note," the Third Circuit has explained that "there is . . . some necessity for finetuning the definition of note to avoid sweeping within the coverage of section 10(b) of the 1934 Act every consumer and business loan financing current operational costs." *Ruefenacht v. O'Halloran,* 737 F.2d 320, 325 (3d Cir.1984) (citing *Lino v. City Investing Co.,* 487 F.2d 689 (3d Cir.1973)). In narrowing the class of "notes" which fall within the securities acts, the Third Circuit declined to adopt a specific test. *Lino,* 487 F.2d at 696 n. 15. *See Ruefenacht, supra* at 323 (finding the *Lino* court's decision not to invoke the "investment contract" analysis set forth in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), significant). Instead, the Third Circuit examined the "commercial context" of the transaction and determined that a personal promissory note tendered

as partial consideration for rights under a franchise agreement was not a security under the federal Acts. *Lino,* 487 F.2d at 694–95. Among the facts relied upon by the Third Circuit in this determination were the following: there was no public offering; the issuer was the party claiming to be defrauded; and the notes were not procured for purposes of speculation or investment. *Id.* The *Lino* court explained

"[T]he Act is designed to deal with substance over form and to regulate and prohibit fraud involved in the sale of promissory notes where such notes are sold or traded for purposes of speculation or investment in the same way that stock [sic], bonds, or debentures might be traded, sold or exchanged."

*Id.* (quoting *McClure v. First National Bank of Lubbock, Texas,* 352 F.Supp. 454, 457 (N.D.Texas 1973), *aff'd* 497 F.2d 490 (5th Cir.1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975)).

As the *Ruefenacht* court noted, the Third Circuit's *Lino* decision spawned a variety of approaches to defining which notes should be considered securities under the Acts. 737 F.2d at 323–25. Each of these tests recognizes the factors identified in *Lino* and supports, to some extent, a distinction between risk capital or investment transactions and notes evidencing individual commercial loans. *Id.* (citing *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 939 (2d Cir.1984) (notes evidencing loans by commercial banks for current operations presumptively excluded from securities laws); *Great Western Bank & Trust Co. v. Kotz,* 532 F.2d 1252, 1257 (9th Cir.1976) (test is whether lender supplies "risk capital" to the maker of the note); *Bellah v. First National Bank of Hereford,* 495 F.2d 1109, 1111–13 (5th Cir. 1974) (adopting distinction between "investment" and "commercial" loan) (further citations omitted). Further, the district courts of the Third Circuit have interpreted *Lino* as authorizing a distinction between investment and commercial contexts, and as supporting the exclusion of commercial notes from the scope of the securities Acts. *Ris-*

*po v. Spring Lake Mews,* 485 F.Supp. 462, 465–66 (E.D.Pa.1980); *Provident National Bank v. Frankford Trust Co.,* 468 F.Supp. 448, 451 n. 5 (E.D.Pa.1979) (citations omitted). *See also Snyco, Inc. v. Penn Central Corp.,* 551 F.Supp. 949, 953–54 (E.D. Pa.1982).

In this case, the parties negotiated a loan for a specific real estate development project, and HRA executed a promissory note secured by a pledge of collateral. This situation is plainly distinct from a note executed in the acquisition of general investment capital. There was no public offering involved. The Note was given in a commercial context, and does not constitute a "security" within the purview of the federal securities Acts.

Defendants have also asserted that certain documents executed in connection with the construction loan transaction, which they have not identified, are "investment contract[s]" included in the definition of a security under the Acts. In *SEC v. Howey, supra,* the Supreme Court identified an investment contract as "a contract, transaction, or scheme whereby an individual invests money in a common enterprise with the expectation of gaining profits solely through the efforts of others." 328 U.S. at 298–99, 66 S.Ct. at 1103. The loan transaction in this case, involving as it did a collateralized note with a fixed interest rate, did not involve the expectation of profits through the efforts of others. The Bank's extension of credit was motivated by the prospect of interest income, which did not depend upon the entrepreneurial or management efforts of HRA. *See United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *Snyco, Inc. v. Penn Central Corp., supra* at 954 (seller of distributorship's contract right to a state percentage of income from sales in one year was not an expectation of sharing in buyer's profits; hence no security was involved).

The Supreme Court recently refined the *Howey* analysis by articulating a distinction between documents which are the subject of common trading, which are properly considered securities, and documents which represent the dickered terms in an individual transaction, which are not securities. *Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 1225, 71 L.Ed.2d 409 (1982) (holding that neither certificate of deposit nor agreement granting share in profits in exchange for guaranteeing loan were securities). The negotiated and renegotiated construction loan in this case had the unique character described in *Marine Bank.* Further, *Marine Bank's* holding that a personal guarantee in the context of such a unique transaction was not a security supports this Court's determination that the Continuing Guaranty executed by Mr. and Mrs. Wolgin is not a security. *Marine Bank, supra. See also Crabtree Investments, Inc. v. Aztec Enterprises, Inc.,* 479 F.Supp. 448, 451 (M.D.La.1979), *reconsid. denied* 483 F.Supp. 211 (M.D.La.1980) ("a continuing guaranty agreement is frequently considered as a 'security device' in that it secures the obligation of another, but it is clearly not an 'investment contract' within the meaning of the statute"). Thus, neither the Continuing Guaranty nor the unspecified documents executed in the loan transaction constitute securities under the Acts.

■ The HRA Limited Partnership is composed of general partners Jack L. Wolgin and Jack L. Wolgin Associates and the limited partner Abohar, N.V., a Netherlands Antilles corporation owned and controlled by three Kuwaiti nationals, the Brothers Al-Marzook. Defendants have argued that the creation and subsequent modification of the HRA Limited Partnership Agreement constituted transactions in securities which were fraudulently induced by the Bank. This argument warrants separate discussion.

As the Second Circuit recently noted, "a limited partnership interest generally is a security because such an interest involves investment 'in a common enterprise with profits to come solely from the efforts of others.'" *Mayer v. Oil Field Systems Corp.,* 721 F.2d 59, 63 (2d Cir.1983) (quoting *Howey, supra,* 328 U.S. at 301, 66 S.Ct.

at 1104) (further citation omitted). Conversely, courts usually find general partnership interests are excluded from the *Howey* definition of "investment contracts" by virtue of the rights of general partners to participate in the management of the partnership's affairs. *See e.g. Goodwin v. Elkins*, 730 F.2d 99, 102–03 (3d Cir.1984) citing *Odom v. Slavik*, 703 F.2d 212, 215 (6th Cir.1983). In *Goodwin v. Elkins*, Judge Garth would have held that no general partnership interest created in accordance with Pennsylvania's partnership laws could qualify as a security because "the role of a general partner, *by law*, extends well beyond the permitted role of a passive investor." 730 F.2d at 103 (emphasis supplied by Judge Garth) (footnote omitted). However, both Chief Judge Seitz and Judge Becker chose to base their decision upon the rights of the plaintiff general partner under the particular agreement involved in *Elkins*. *See* 730 F.2d at 112 (Seitz, C.J., concurring); *Id.* at 113 (Becker, J., concurring). *Elkins* illustrates the Third Circuit's inclination to look beneath labels to the "commercial reality" of the transaction, in light of the purpose the securities acts were designed to serve. *See Howey*, 328 U.S. at 298–99, 66 S.Ct. at 1103; *Lino*, 487 F.2d at 696 n. 15 (rejecting a black and white approach to status of promissory notes under securities acts). *See also Gordon v. Terry*, 684 F.2d 736, 740–41 & n. 5 (11th Cir.1982) (while acknowledging general distinction between general and limited partnership interests, court did not find label dispositive on security question: "The agreement in this case, however, lacks the attributes of a limited partnership because it permits the partners to control, by majority vote, the general partners' decisions regarding partnership property."), *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983). As Professor Loss has explained:

> [I]nterests in partnerships may be securities .... [I]t is substance, not form, that controls .... The problem, as Judge Frank put it when he was Chairman of the SEC, is to distinguish between the public offering of securities parading as "limited partnership interests" and "an offering of a half interest in a hamburger stand."

Loss, *Fundamentals of Securities Regulation*, 198–99 (1983).

HRA's "sale" of a limited partnership interest to Abohar was the result of a negotiated agreement tailored to meet Jack Wolgin's need for capital to finance the Hotel Rittenhouse project and Abohar's interest in protecting its investments. Section 3.03 of the Limited Partnership Agreement states that HRA's general partners shall not have the power to dispose of or encumber partnership property, remove or appoint a managing operator of the project, or admit additional general partners without the approval of the limited partner Abohar, Inc.[1] *See Gordon v. Terry, su-*

---

**1.** Section 3.03 of the HRA Limited Partnership Agreement states that:

> General Partners shall not be empowered or authorized to do the following acts unless and until Marzook or Marzook's Representative has approved the following acts of the General Partners ... (a) the appointment, or the termination of the appointment, of a managing operator of the project; (b) sale, exchange, lease or other disposition of all or any part of the real property of the Partnership or all or substantially all of the personal property of the Partnership, the encumbering by mortgage, deed of trust or other security agreement, of all or any part of the real property of the Partnership. A reasonable condition of the approval of any sale may be Marzook's requirement that the Marzook interest in the Partnership be purchased prior to the

sale; (c) the admission of any person as a general partner in the Partnership; (d) amending the Partnership Agreement; (e) entering any contract for the expenditure of an amount in excess of $250,000,000 which expenditure will or would be expected to cause the aggregate Constructions Costs to exceed 21 million dollars; (f) entering into any agreement obligating the Partnership on matters calling for Limited Partner approval.

In the HRA Limited Partnership Agreement, "Marzook" is used to refer to the limited partner ABOHAR. *See* Introductory Paragraph of Hotel Rittenhouse Associates Amended and Restated Limited Partnership Agreement, dated January 17, 1979.

The Court also takes note of the fact that the defendants in this case filed a third party complaint against Abohar and its shareholders which alleged that Abohar had forfeited its lim-

*pra.* The unique quality of the arrangement is apparent in these negotiated terms. *See Marine Bank, supra.* As such, this transaction is distinguishable ' from the large scale investment schemes involved in the cases referred to by the Second Circuit in *Mayer. See Mayer, supra* (class action by limited partners of several limited partnerships against common general partner corporation for fraudulent circumvention of limited partners' payback rights). The *Mayer* court's qualified language is instructive: "Where the investing limited partners exercised *no managerial role* in the partnership's affairs, courts have held that limited partnership interests are securities, *at least when, as here, there were a considerable number of limited partners." Mayer, supra,* at 65 (emphasis added). (Citing *S.E.C. v. Holschuh,* 694 F.2d 130, 137 (7th Cir.1982) (corporation's efforts to finance development of coal leases through public offering of limited partnership interests to outside investors falls within Act's registration requirements); *S.E.C. v. Murphy,* 626 F.2d 633, 640–41 (9th Cir.1980) (public offering of limited partnership shares in over 30 limited partnerships subject to registration requirements of securities laws); *Goodman v. Epstein,* 582 F.2d 388, 406–08 (7th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979) (eight limited partners sued general partners in land development scheme under 10b–5); *Hirsch v. DuPont,* 396 F.Supp. 1214, 1215–16, 1227–28 (S.D.N.Y.1975), *aff'd* 553 F.2d 750 (2d Cir.1977) (merger of three brokerage firms created new firm with 74 general partners and "several" limited partners and assets of $400 million)).

The partnership agreement in this case involved two general partners, Jack Wolgin and Jack Wolgin Associates, Inc., and one limited partner, Abohar, Inc. There was no public offering of limited partnership inter-

ests. The approval rights reserved to the limited partner give Abohar greater protection than limited partners in a larger enterprise. In addition, the cases referred to by the Second Circuit involved either the registration requirement of the Acts or a claim by the limited partners that the general partner(s) had engaged in some sort of overreaching. In these cases, classifying the interests as securities was consistent with the purposes of the Securities Acts. It is much more unlikely that Congress intended the Acts to address cases such as the present one. *See Marine Bank, supra,* 455 U.S. at 556, 102 S.Ct. at 1223 (Congress did not intend to create a federal cause of action for common fraud).

Because none of the documents referred to by defendants constitutes a security within the federal securities Acts, the Bank's motion for summary judgment on Count IX of defendants' counterclaim will be granted.

### Racketeer Influenced and Corrupt Organizations Act

In Count VIII of their counterclaim, defendants have asserted a violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (1980). Defendants request partial summary judgment on Count VIII to the extent the claim is predicated upon an alleged violation of the federal securities laws. Because this Court has granted summary judgment on the securities claims (Count IX), defendants' request for partial summary judgment on Count VIII will also be granted.

### Equal Credit Opportunity Act

Count XII of defendants' counterclaim asserts that the Bank "required the signature of Muriel Wolgin, the spouse of Jack L. Wolgin, on [the Continuing Guaranty] in violation of the Equal Credit Opportunity Act [(ECOA)], 15 U.S.C. § 1691 *et seq.,*

ited liability by participating in the control of HRA. In effect, defendants claimed that the exercise of the rights reserved in section 3.03 made Abohar into a general partner. *See* Third Party Complaint. Quoting section 3.03, defendants argued, "These are not the rights of a pas-

sive investor, akin to a corporate shareholder. Instead, they are insufficient to give rise to liability as general partners, as alleged by HRA and the Wolgins." Memorandum in Support of Reply of Third Party Plaintiffs to Motion to Dismiss the Third Party Complaint, at 14.

and the Regulations promulgated thereunder, 12 C.F.R. § 202.7."

The relevant section of the ECOA provides "It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—(1) on the basis of ... marital status ...." The Federal Reserve Board regulations provide:

> Except as provided in this subsection, a creditor shall not require the signature of an *applicant's* spouse or other person, *other than a joint applicant*, on any credit instrument if the applicant qualifies under the creditor's standard of creditworthiness for the amount and terms of the credit requested.

12 C.F.R. § 202.7(d) (1984) (emphasis added).

 The first problem with defendants' ECOA claim is that *HRA* was the entity which applied for and received credit, *not Jack Wolgin.* Because Jack Wolgin signed the Continuing Guaranty as a guarantor, he does not fall within the definition of credit "applicant" under the ECOA. 12 C.F.R. § 202.2(e) (excluding guarantors, sureties, and endorsers). Moreover, even if the execution of the Continuing Guaranty *were* an application for credit, the regulations do not prohibit requiring the signature of both spouses on a joint application. 12 C.F.R. § 202.7(d), *supra.* Loan officer Joan Ratley has stated that because the Wolgins offered to execute a joint guarantee, Jack Wolgin was never evaluated on the basis of his individual creditworthiness. Ratley affidavit at 2. Defendants have not produced any evidence to rebut Ms. Ratley's statement that the Bank did not consider the creditworthiness of Jack Wolgin individually because an individual guarantee was never contemplated.

When the party who moves for summary judgment relies upon affidavits, depositions, or answers to interrogatories, the nonmoving party must produce comparable evidentiary material to contradict the moving party's showing. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160–61, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970).

The Bank's motion for summary judgment on Count XII is therefore granted.