MARYLAND NATIONAL
BANK, Plaintiff,

v.

DAUPHIN DEPOSIT BANK AND
TRUST COMPANY and Archie
R. Battistelli, Defendants.

Civ. A. No. 84–1365.

United States District Court,
M.D. Pennsylvania.

Nov. 18, 1986.

Michael Doctrow, David E. Lehman, McNees, Wallace & Nurick, Harrisburg, Pa., for plaintiff.

Gary French, R. Stephen Shibla, Charles J. Ferry, Rhoads & Sinon, Harrisburg, Pa., for defendants.

## MEMORANDUM

RAMBO, District Judge.

*Procedural Background*

Before this court is the motion of defendants Dauphin Deposit Bank and Trust Com-

pany (Dauphin Deposit) and Archie R. Battistelli for summary judgment, filed on March 10, 1986 pursuant to Federal Rule of Civil Procedure 56. Defendants assert that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Further, defendants assert that (1) there exists no pattern of racketeering activity under 18 U.S.C. § 1962—Racketeer Influenced and Corrupt Organizations (RICO); and (2) that discovery has established conclusively that there existed no fraud or "wire fraud" on defendants' part and that defendants acted on advice of counsel in good faith. For purposes of a summary judgment motion, the record must be viewed in the light most favorable to the party opposing the motion.

*Factual Background*

The undisputed facts are as follows:

1. In May of 1982, Dauphin Deposit loaned Stafford Laboratories (Stafford) $3,000,000 to purchase Whitmoyer Laboratories. The loan was secured by a mortgage on the plant facilities and the personal guaranty of Frank Lucero, the President of Stafford Laboratories, and his wife.

2. In May of 1982, Dauphin Deposit established a line of credit for Stafford in the amount of $500,000 for the operation of Whitmoyer Laboratories.

3. In addition to the mortgage on the Whitmoyer Laboratories plant facility, Dauphin Deposit perfected security interests in Whitmoyer Laboratories' accounts receivable, inventory and equipment.

4. In May of 1983, Dauphin Deposit renewed Stafford's line of credit to operate Whitmoyer Laboratories and raised the line to 1.1 million dollars.

5. In the spring of 1983, Maryland National Bank solicited business in central Pennsylvania by mailing pamphlets promoting its services to various companies including Whitmoyer Laboratories.

6. As a result of this contact, a meeting was held between two Maryland National Bank employees, Carey Jackson and Frances Manus, and Frank Lucero, President of Stafford, to discuss financing for Stafford's anticipated acquisition of Sterwin, the Animal Health Division of the Sterling Drug Company.

7. In preparation for presenting the Stafford loan for approval to Maryland National Bank's Commercial Loan Committee, Jackson obtained 1980 and 1981 unqualified financial statements on Stafford and a 1982 financial review prepared by Touche Ross.

8. During the fall of 1983, Jackson contacted Bruce Burley, a senior partner in Touche Ross's Philadelphia office, to discuss Stafford's acquisition of Sterwin and Burley's acceptance of a position at Sterwin if Stafford acquired Sterwin.

9. In the fall of 1983, Carey Jackson also received and reviewed documents detailing the loans from Dauphin Deposit to Stafford in preparation for presenting the loan to Stafford.

10. No one at Maryland National Bank contacted Dauphin Deposit for information concerning Stafford during the fall of 1983.

11. On the basis of the financial information received on Stafford and information obtained concerning Sterwin, Maryland National Bank's Commercial Loan Committee approved a loan to Stafford for the acquisition of Sterwin in early October of 1983.

12. Following the approval of the Commercial Loan Committee the loan was approved by Maryland National Bank Executive Committee on October 13, 1983.

13. In late 1983, Stafford was searching for a financial institution to replace Dauphin Deposit or to supplement Dauphin Deposit's line of credit, and Maryland National Bank considered doing so.

14. In January of 1984, Maryland National Bank agreed to loan $500,000 to Stafford under a demand note, with Lucero's and his wife's joint and several guaranty as security.

15. In preparation for a second loan presentation to Maryland National Bank's Commercial Loan Committee involving Stafford, Carey Jackson received an internally prepared financial statement on Staf-

ford from Frank Lucero in January of 1984.

16. The Executive Committee of Maryland National Bank approved a term of loan of 3.2 million dollars to Stafford on or about January 26, 1984 which was to be secured by a mortgage on the Whitmoyer Laboratories' plant facilities.

17. Two of the conditions for approval of the 3.2 million dollar term loan were:
a) a minimum appraisal of 6.4 million dollars on the Stafford Laboratories real estate and facilities; and
b) receipt of a 1983 audited Stafford Laboratories' financial statement.

18. A thorough appraisal of the Whitmoyer Laboratories' facilities was done by Maryland National Bank's real estate department and, as a result, the term loan was reduced from 3.2 million to 3 million dollars.

19. Carey Jackson received a 1983 financial statement on Stafford from Frank Lucero in early April of 1984 which was fully reviewed by Maryland National Bank personnel in anticipation of booking the loan.

20. Frank Lucero represented that the statement had been prepared by Touche Ross after a full audit.

21. Dauphin Deposit also received a 1983 financial statement from Frank Lucero in early April of 1984 which had allegedly been prepared by Touche Ross after a full audit.

22. On or about April 10, 1984, in preparation for an April 13, 1984 "closing" on the approved loan to Stafford, Carey Jackson contacted Archie Battistelli, a bank official with Dauphin Deposit, to receive the "pay-off" figures for Dauphin Deposit's loans to Stafford.

23. Carey Jackson's telephone call to Archie Battistelli was the first contact between Maryland National Bank and Dauphin Deposit concerning Stafford.

24. In addition to requesting "pay-off" figures, Carey Jackson asked Archie Battistelli whether Stafford had been a good customer of Dauphin Deposit, as part of Maryland National Bank's credit analysis of Stafford.

25. In response to Carey Jackson's credit inquiry concerning Stafford, Archie Battistelli responded that Stafford had been a good customer, but a little slow-paying lately.

26. Stafford had made timely payments on its loans until the end of 1983 when payments fell behind and, in April of 1984, Stafford was ninety days delinquent in paying interest on its line of credit.

27. Carey Jackson sought no other credit information from Dauphin Deposit concerning its Stafford account at any time during 1984.

28. After receiving "pay-off" figures from Dauphin Deposit, the closing date was postponed until April 27, 1984.

29. The closing date was postponed after Maryland National Bank received the "pay-off" figures and determined that the loan it had approved for Stafford was not sufficient to fully "take-out" Dauphin Deposit.

30. On April 27, 1984, a dry closing was held in which Stafford entered into a loan agreement with Maryland National Bank and issued and delivered to Maryland National Bank loan documents including an installment note (mortgage loan) for 3 million dollars and a revolving loan note of 1 million dollars. The installment loan was intended to pay out Stafford's mortgage loan with Dauphin Deposit. The revolving loan was to be funded over a period of time in amounts in Maryland National Bank's discretion based in part on Stafford's financial condition.

31. On May 3, 1984, Maryland National Bank wired Dauphin Deposit the funds necessary to "pay-off" the mortgage.

32. Dauphin Deposit subsequently satisfied its mortgage.

33. As of May 3, 1984, Maryland National Bank had not paid off Stafford's line of credit with Dauphin Deposit which amounted to approximately 1.1 million dollars.

34. On or about June 22, 1984, Archie Battistelli wrote a letter to Frank Lucero concerning the Stafford line of credit and concerns as to the financial statements purportedly prepared by Touche Ross.

35. On or about June 28, 1894, Thomas H. Yeager telephoned Dauphin Deposit concerning Frank Lucero. Thomas Yeager identified himself as a federal probation and parole officer from Phoenix, Arizona.

36. Or or about June 29, 1984, Archie Battistelli telephoned Thomas Yeager. Yeager advised Archie Battistelli that Frank Lucero had pleaded guilty to the forgery of government documents and was scheduled to be sentenced on July 16, 1984 to up to five years in prison.

37. Yeager asked Battistelli if Frank Lucero was crucial to Whitmoyer Laboratories' operation and what impact, if any, Whitmoyer Laboratories had on the Lebanon County economy.

38. Thomas Yeager also advised Archie Battistelli that the Price Waterhouse financial statements presented by Lucero to Chase Manhatten Bank several years ago were fictitious. Archie Battistelli noted that these were probably the same financial statements which Dauphin Deposit had on file.

39. It is disputed that Thomas Yeager told Archie Battistelli that their conversation concerning Frank Lucero should be kept confidential.

40. Archie Battistelli reported his conversation with Thomas Yeager to William King, the President of Dauphin Deposit.

41. William King told Archie Battistelli to relate his conversation with Thomas Yeager to Dauphin Deposit's legal counsel.

42. Archie Battistelli first advised Dauphin Deposit's legal counsel of his conversation with Thomas Yeager and of Stafford's delinquency with respect to its line of credit on or about June 29, 1984.

43. During his meeting with Archie Battistelli, Henry Rhoads, Dauphin Deposit's legal counsel, attempted unsuccessfully to contact Thomas Yeager.

44. Henry Rhoads also attempted unsuccessfully to reach someone at Touche Ross to verify that the 1983 audited financial statements on Stafford which Dauphin Deposit had received from Frank Lucero had been prepared by Touche Ross.

45. Henry Rhoads advised Archie Battistelli not to relate his conversation with Thomas Yeager to Frank Lucero until Dauphin Deposit had taken steps to secure its collateral. No advice was provided by Henry Rhoads concerning disclosure to or communications with Maryland National Bank.

46. On July 2, 1984, Henry Rhoads and Archie Battistelli spoke with Mr. Boyadjian, an accountant at Touche Ross, concerning the 1982 and 1983 Stafford financial statements purportedly issued by Touche Ross. Initially, Mr. Boyadjian told Henry Rhoads [and Archie Battistelli] that he did not believe Touche Ross had issued financial statements on Stafford for either 1982 or 1983 but that he would check the file.

47. Mr. Boyadjian contacted Henry Rhoads and Archie Battistelli later that day and told them that Touche Ross in fact did not issue such financial statements and he asked for a copy of the reports Dauphin Deposit had on file.

48. Henry Rhoads testified that Mr. Boyadjian told him Touche Ross had prepared a draft financial statement for 1982 but that he did not believe Touche Ross had ever actually issued a statement for either 1982 or 1983.

49. Mr. Rhoads' opinion concerning the nature of Mr. Boyadjian's statements is a disputed fact.

50. On July 3, 1984, Dauphin Deposit decided to call its loan and to notify all parties of its intention. However, Dauphin Deposit failed to disclose this information to Maryland National Bank at that time.

51. On or about July 3, 1984, the Sheriff of Lebanon County was notified of Dauphin Deposit's intent to padlock Whitmoyer Laboratories on July 5, 1984.

52. Archie Battistelli telephoned Carey Jackson on July 3, 1984 and requested a meeting for July 5, 1984 concerning Stafford. Archie Battistelli also requested in-

formation concerning the status of Maryland National Bank's payments to Dauphin Deposit on the Stafford account.

53. Carey Jackson responded that no one would be available to meet with Dauphin Deposit officials on July 5, 1984. He did not request any further information from Archie Battistelli.

54. On July 5, 1984, Archie Battistelli met with Frank Lucero to explain what was involved in calling a loan and to obtain Whitmoyer Laboratories' list of accounts receivable. Archie Battistelli advised Frank Lucero that Dauphin Deposit was freezing the Stafford Labs bank account and that Frank Lucero had to pay 1.1 million dollars on July 5, 1984 in order to prevent foreclosure by Dauphin Deposit. It is disputed whether defendants induced Frank Lucero to contact Maryland National Bank and prompt their payment to Dauphin Deposit.

55. On July 5, 1984, after his meeting with Archie Battistelli, Lucero contacted Carey Jackson and told him that Dauphin Deposit was pursuing him for some reduction in his line of credit and to inquire whether Maryland National Bank would pay off Stafford's line of credit with Dauphin Deposit.

56. It is disputed that Archie Battistelli spoke with Henry Rhoads and Fred Wolfson, Dauphin Deposit's legal counsel in Lebanon County, both before and after his meeting with Frank Lucero.

57. It is disputed that Henry Rhoads advised Archie Battistelli to answer all questions asked by Carey Jackson concerning the 1983 Touche Ross statement fully and truthfully but not to volunteer any information concerning Dauphin Deposit's attempts to verify the accuracy of the Touche Ross financial statement received from Frank Lucero in April of 1984.

58. Archie Battistelli spoke with Carey Jackson on the morning of July 5, 1984, and stated that Dauphin Deposit wanted the loan paid in full. It is disputed whether Archie Battistelli advised Carey Jackson that Dauphin Deposit's loan with Stafford had been called and that Dauphin Deposit was proceeding against its collateral.

59. In response to Battistelli's request for payment, Jackson responded that it was impossible for Maryland National Bank to take out the Dauphin Deposit loan, given the outstanding loan facility, but that Maryland National Bank might be able to advance between $200,000 and $300,000.

60. Carey Jackson spoke with Battistelli on the phone, after consulting with his superiors, and offered to advance $200,000 to $300,000 to Dauphin Deposit. During that conversation Carey Jackson and Archie Battistelli agreed that Maryland National Bank would advance $600,000 to Dauphin Deposit.

61. Carey Jackson did not solicit any information concerning the 1983 Touche Ross statement during that telephone conversation.

62. Archie Battistelli did not volunteer any information concerning suspicions regarding the authenticity of the 1983 Touche Ross statement. However, it is disputed that Archie Battistelli acted in good faith on the advice of counsel.

63. Maryland National Bank wired Dauphin Deposit $600,000 on the afternoon of July 5, 1984 to reduce Stafford's line of credit with Dauphin Deposit to approximately $500,000.

*Discussion*

■ Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Further, when a summary judgment motion is supported by depositions and exhibits, the non-moving party may not rely on the pleadings alone but must either produce evidence demonstrating the existence of a genuine issue of material fact or establish her right to relief as a matter of law. *Bank of America National Trust and Savings Association v. Hotel Rittenhouse Associates,* 595 F.Supp. 800, 808 (E.D.Pa. 1984). Defendants' Motion for Summary Judgment presents several issues which the court shall address *seriatim.*

■ First, defendants contend that summary judgment must be granted on plain-

tiff's RICO counts where plaintiff has failed to establish that defendants participated in a pattern of racketeering activity. The definitions section of the RICO Act states, "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Although this question was not specifically before the Supreme Court, some guidance as to what was necessary to fulfill the pattern requirement was provided in *Sedima, S.P. R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed. 346 (1985).

Courts have taken various approaches to the pattern requirement in RICO. Some courts required that the multiple predicate acts be related and ongoing in nature to constitute a pattern. *Paul S. Mullin and Assoc., Inc. v. Bassett*, 632 F.Supp. 532 (D.Del.1986); *Bush Development Corp. v. Harbour Place Associates*, 632 F.Supp. 1359 (E.D.Va.1986); *Allington v. Carpenter*, 619 F.Supp. 474 (C.D.Cal.1985). Other courts found that multiple related predicate acts in a single fraudulent scheme would be enough to establish a pattern. *R.A.G.S. Conture, Inc. v. Hyatt*, 774 F.2d 1350 (5th Cir.1985); *Trak Microcomputer Corp. v. Wearne Bros.*, 628 F.Supp. 1089 (N.D.Ill. 1985); *Conan Properties, Inc. v. Mattel, Inc.*, 619 F.Supp. 1167 (S.D.N.Y.1985).

In *Sedima*, the Court stated,

[t]he extraordinary uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of "pattern."

473 U.S. at ――, 105 S.Ct. at 3287, 87 L.Ed. at 361. The court also stated in footnote 14,

As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that

a pattern *"requires* at least two acts of racketeering activity," § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "the target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong.Rec. 18940 (1970) (statement of Sen. McClellan). See also *id.*, at 35193 (statement of Rep. Poff ) (RICO "not aimed at the isolated offender"); House Hearings, at 665. Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e). This language may be useful in interpreting other sections of the Act. Cf. *Iannelli v. United States*, 420 U.S. 770, 789 [95 S.Ct. 1284, 1295–96, 43 L.Ed.2d 616] (1975).

*Sedima*, 473 U.S. at ――, 105 S.Ct. at 3285, 87 L.Ed. at 358–59. The Eighth Circuit Court of Appeals adopted this approach in *Superior Oil Co. v. Fulmer*, 785 F.2d 252, 257 (8th Cir.1986), finding that although Superior Oil had proved the relationship prong, they had failed to prove the continu-

ity sufficient to form a pattern of racketeering activity.

In addition, although not specifically addressed by the majority in *Sedima*, Justice Powell confronted the pattern requirement directly in his dissent. Thus, Powell states,

> [t]he definition of "pattern" may thus logically be interpreted as meaning that the presence of the predicate acts is only the beginning: something more is required for a "pattern" to be proved.... The ABA Report suggests that to effectuate this legislative intent, "pattern" should be interpreted as requiring that (i) the racketeering acts be related to each other, (ii) they be part of some common scheme, and (iii) some sort of continuity between the acts or a threat of continuing criminal activity must be shown.... By contrasting "pattern" to focus on the manner in which the crime was perpetrated, courts could go a long way toward limiting the reach of the statute to its intended target—organized crime.

*Sedima*, 473 U.S. at ——, 105 S.Ct. at 3290, 87 L.Ed. at 378 (Powell, J., dissenting). Other authorities also advocate narrowing the remedy available in civil RICO suits.[1] The Illinois court considered the pattern requirement of a RICO claim in *Northern Trust Bank/O'Hare N.A. v. Inryco, Inc.*, 615 F.Supp. 828 (N.D.Ill.1985). In that case the court concluded that multiple fraudulent acts in a single fraudulent scheme can not constitute a "pattern." *Id.* at 833. Other courts have held that a single scheme can be enough to constitute

a pattern. *Trak Microcomputers Corp. v. Wearne Bros.*, 628 F.Supp. 1089 (N.D.Ill. 1985). This court finds the approach and reasoning of the *Northern Trust Bank* to be more persuasive.

In the case at bar, this court finds that the plaintiffs have not alleged the predicate acts beyond a single scheme, sufficient to fulfill the pattern of racketeering activity requirement. The alleged acts of defendants may have comprised one scheme to induce plaintiff to replace Dauphin Deposit as Whitmoyer Laboratories' primary lender. However, there are no facts alleged, and no proof that defendants have engaged in this type of activity in the past, nor that they were engaged in this type of activity elsewhere. The Senate Report stresses the threat of continuing activity which the single alleged fraudulent scheme does not present in this case. This court agrees with the Illinois court which stated, "[s]urely the continuity inherent in the term presumes repeated criminal *activity*, not merely repeated *acts* to carry out the *same* criminal activity. It places a real strain on the language to speak of a single fraudulent effort, implemented by several fraudulent acts, as a 'pattern of racketeering activity.'" *Northern Trust Bank/O'Hare N.A. v. Inryco, Inc.*, 615 F.Supp. 828, 831 (N.D.Ill.1985) (emphasis in original). Therefore, the court must grant defendants' Motion for Summary Judgment as to plaintiff's RICO claim.

■ Second, defendants contend that plaintiff Maryland National Bank has not

---

1. This court accepts the guidance from a resolution of the Judicial Conference of the United States, which states,

    > Responding to the request of the Chairmen of the Senate and House Committees on the Judiciary for the views of the Judicial Conference as to the impact of civil RICO actions under 18 U.S.C. 1964(c), the Conference observes that the statute, among other things, appears to recognize federal jurisdiction in each and every case in which two or more instances of mail or wire fraud are alleged to have occurred.
    >
    > The extraordinary penalties provided by the civil RICO statute (treble damages and attorney fees) are rapidly causing what would formerly have been considered routine breach of contract or common law fraud actions triable

    only in state courts, in the absence of diversity, to be filed in federal courts. This not only increases the burden on the federal courts, but causes friction with the state court system.

    Further, in that actions under the statute may be predicated on federal securities or antitrust violations, the statute overlaps and may tend to confuse well-established separate regulatory schemes.

    For these reasons, the Judicial Conference respectfully suggests that the Congress should seriously consider narrowing the reach of this statute.

    Report of the Proceedings of the Judicial Conference of the United States, pp. 11–12 (March 11–12, 1986).

and cannot establish wire fraud under 18 U.S.C. § 1343 on the part of either Dauphin Deposit or Archie Battistelli, thus entitling them to summary judgment. It is not necessary to address the alleged wire fraud which is a necessary element of plaintiff's RICO claim, because the court is granting summary judgment to defendants on the RICO claim.

■ Third, defendants contend they had no legal obligation to disclose their "unverified suspicions" to the plaintiff, a competing bank. In order to consider this argument, the court must delve into Pennsylvania law regarding when and between whom the duty to disclose arises. Generally, liability for an omission is imposed only when an independent duty to disclose exists. *Staffin v. Greenberg*, 672 F.2d 1196, 1202 (3d Cir.1982). One such circumstance, when an independent duty to disclose arises, occurs when a fiduciary relationship exists between the parties. *Federal Land Bank of Baltimore v. Fetner*, 269 Pa.Super. 455, 410 A.2d 344 (1979). However, "[a]n independent duty to speak may also arise in certain circumstances absent a fiduciary relationship." *City of Harrisburg v. Bradford Trust Co.*, 621 F.Supp. 463, 473 (M.D.Pa.1985). This court stated in *Bradford* that the following factors should be considered in determining whether a duty to speak exists: 1) the relationship between the plaintiff and defendant; (2) the parties' relative access to the information to be disclosed; (3) the benefit derived by the defendant from the transaction; (4) defendant's awareness of plaintiff's reliance on defendant in making its investment decisions; and (5) defendant's role in initiating the transaction. *Id.* In addition, "even without a fiduciary relationship or another independent duty to speak, an omission may be actionable 'where the defendant has revealed some relevant, material information even though he had no duty (*i.e.*, a defendant may not deal in half-truths).'" *City of Harrisburg v. Bradford Trust Co.*, 621 F.Supp. 463, 473–74 (M.D.Pa.1985), quoting *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir.1977).

In the case at bar, defendants argue that they had no duty to speak. An analysis of the pertinent factors in this case reveals that the two banks were competing institutions and that defendant benefitted substantially from the transaction. However, it is disputed what was the parties' relative access to the information, what was the defendant's awareness of plaintiff's reliance on them and what was the defendant's role in initiating the transaction. Depending on the resolution of those facts a duty to disclose may exist. As stated by the Massachusetts court in *Catalina Yachts v. Old Colony Bank and Trust Co.*, 497 F.Supp. 1227, 1236 (D.Mass.1980), "[w]hile a bank may have no duty in the abstract to disclose financial information about its customers, it may not engage in selective disclosure designed to misrepresent the financial status of its customer." In that case the court found a genuine issue of fact existed regarding the bank's fraudulent conduct, thus precluding the granting of summary judgment.

In the case at bar, whether the communications between Battistelli and Jackson, when considered in the context of the surrounding circumstances, were misleading, whether the communications were intended by the defendant to be misleading and whether the statements were reasonably relied upon by the plaintiff, are questions to which genuine questions of fact exist and they are for the trier of fact. Therefore, this court must deny defendants' Motion for Summary Judgment.

### ORDER

In accordance with the accompanying Memorandum, IT IS HEREBY ORDERED THAT:

1) defendants' Motion for Summary Judgment is granted only to the RICO claims;

2) defendants' Motion for Summary Judgment is denied as to all other claims;

3) the Clerk of Court is directed to enter judgment in favor of defendants and against plaintiff as to the RICO claims only.