**B. C. RECREATIONAL INDUSTRIES, Harry Fireman, Paul Fireman, Steven Fireman and Richard W. Wennett, Executor of the Estate of Samuel Fireman, Plaintiffs-Appellants,**

v.

**The FIRST NATIONAL BANK OF BOSTON, John Horvitt, Clark Miller, Benjamin Bowden, Victor Mourey and Robert Weisberg, Defendants-Appellees.**

**No. 80–1383.**

United States Court of Appeals, First Circuit.

Argued Nov. 4, 1980.

Decided Jan. 30, 1981.

Morris Michelson, Boston, for plaintiffs-appellants.

Francis H. Fox, Boston, with whom Rory Fitzpatrick, and Bingham, Dana & Gould, Boston, were on brief, for defendants-appellees.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, HOFFMAN,* District Judge.

BOWNES, Circuit Judge.

This is an appeal from an order of the district court granting defendants' motion for summary judgment on two counts of a nine-count complaint and dismissing the seven remaining counts. The complaint was brought by B.C. Recreational Industries (BC) and its principal shareholders, officers, and directors, Harry, Paul, Steven, and Samuel Fireman, against the First National Bank of Boston (Bank), the FNB Financial Company (FNB), John Horvitt,** a former financial advisor of BC, and four other individuals alleged to be officers of the Bank.

* Of the Eastern District of Virginia, sitting by designation.

A summary of the undisputed facts is necessary to understand the complaint and the issues before us. In September of 1964, BC entered into a factoring agreement with the Bank. In 1969 the Bank assigned all of its interest in BC's loan and collateral to First National Factors of Boston, a newly organized affiliate of the Bank. The same individuals who had handled BC's factors loan at the Bank continued in the same role for First National Factors. On September 1, 1970, BC executed a new factoring agreement with First National Factors and, pursuant thereto, gave it a security interest in all of the property held by the Bank as collateral. The collateral at this time was the usual type for a factors loan, an assignment of all accounts receivable.

In 1972 First National Factors changed its name to FNB Financial Company. There was no change in the factoring arrangement, and BC continued to deal with the same individuals. FNB was organized as a Massachusetts business trust. All of its shares were owned or controlled by First National Boston Corporation, a bank holding company that also owned all of the stock of the Bank. The three corporate entities—the Bank, FNB, and First National Boston Corporation—were located in the same building, shared common offices, had common directors, and, at times, used one another's stationery.

In August 1972 FNB required BC to employ John Horvitt as a full-time business advisor, because it felt that BC was in a precarious financial condition. Horvitt continued as a business advisor to BC until early in May 1974. BC filed a Chapter XI bankruptcy proceeding on July 2, 1974.

From a stipulation dated December 23, 1974, and filed in BC's bankruptcy proceeding, it also appears that in August of 1972 the Fireman Realty Trust, a trust comprised of the owners and directors of BC, granted to FNB, as agent for the Bank, mortgages on certain properties owned by the trust in Miami, Florida, and in Brain-

** Appellants spell Horvitt with two "t's"; appellees use one. We apologize to the gentleman if our spelling is incorrect.

tree and Stoughton, Massachusetts. The trust also granted to the Bank a security interest in a beneficial interest of the trust in real estate in Chicago, Illinois. The stipulation also recites that Steven, Paul, Harry, and Samuel Fireman pledged private stockholdings to the Bank as further security for the loan.

The main thrust of the complaint is that the Bank, using FNB as a subsidiary, forced BC to hire Horvitt and that its purpose in doing so was not to strengthen the business position of BC, but to manage it so that the Bank's factors lien would be fully protected at all times. It is alleged that Horvitt insisted on increasing BC's line of credit with manufacturers and suppliers, thus increasing the debt owed the Bank at high interest rates. The management policy of Horvitt, allegedly carried out in concert with and at the request of the Bank, resulted, plaintiffs claim, in injury to BC, its shareholders and directors.

Paragraph two of the complaint grounds jurisdiction on 28 U.S.C. § 1348 [1] (banking association as party) and 28 U.S.C. § 1337 [2] (antitrust violations). Its causes of action are predicated on 12 U.S.C. § 1975,[3] which grants a federal civil remedy to any person injured by the tying arrangement prohibited in 12 U.S.C. § 1972, and 15 U.S.C. § 15,[4] which grants a federal cause of action to a person injured in business or property by violations of the antitrust laws.

Count I alleges that the defendants violated the tying prohibitions of 12 U.S.C. § 1972 [5] by forcing plaintiffs to hire Horvitt

1. § 1348. Banking association as party

The district court shall have original jurisdiction of any civil action commenced by the United States, or by direction of any officer thereof, against any national banking association, any civil action to wind up the affairs of any such association, and any action by a banking association established in the district for which the court is held, under chapter 2 of Title 12, to enjoin the Comptroller of the Currency, or any receiver acting under his direction, as provided by such chapter.

All national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located.

2. § 1337. Commerce and antitrust regulations; amount in controversy, costs

(a) The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies: *Provided, however,* That the district courts shall have original jurisdiction of an action brought under section 20(11) of part I of the Interstate Commerce Act (49 U.S.C. 20(11) or section 219 of part II of such Act (49 U.S.C. 319), only if the matter in controversy for each receipt or bill of lading exceeds $10,000, exclusive of interest and costs.

(b) Except when express provision therefor is otherwise made in a statute of the United States, where a plaintiff who files the case under section 20(11) of part I of the Interstate Commerce Act (49 U.S.C. 20(11) or section 219 of part II of such Act (49 U.S.C. 319), originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of any interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.
(As amended Oct. 20, 1978, Pub.L. 95–486, § 9(a), 92 Stat. 1633.)

3. § 1975. Civil actions by persons injured; jurisdiction and venue; amount of recovery.

Any person who is injured in his business or property by reason of anything forbidden in section 1972 of this title may sue therefor in any district court of the United States in which the defendant resides or is found or has an agent, without regard to the amount in controversy, and shall be entitled to recover three times the amount of the damages sustained by him, and the cost of suit, including a reasonable attorney's fee.
Pub.L. 91–607, Title I, § 106(e), Dec. 31, 1970, 84 Stat. 1767.

4. § 15. Suits by persons injured; amount of recovery

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of the suit, including a reasonable attorney's fee.

5. 12 U.S.C. § 1972 provides in pertinent part:

(1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—

as a financial advisor. The district court granted summary judgment on the following grounds: that FNB was not the agent or subsidiary of the Bank; that, since the factoring agreement was with FNB, there could be no violation of 12 U.S.C. § 1972 because FNB was not a bank; that there was no showing of any anticompetitive tying arrangement.

Count II alleges that the forced hiring of Horvitt was an "illegal tie-in in restraint of a free market and free trade" in violation of 15 U.S.C. §§ 1–7. This count was dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action.

Count IV alleges that the Bank violated 12 U.S.C. § 92a(a) [6] by acting in a fiduciary capacity without obtaining a permit from the Comptroller of the Currency. The district court granted summary judgment on the ground that FNB, the lending entity, was not a bank and, therefore, not subject to the statute.

Count VIII, which was added in the amended complaint, does not set forth a specific cause of action. It is a summary of Counts I and II and alleges a violation of "Title 12 and Title 15 of U.S.C."

Counts III, V, VI, VII and IX are based on alleged violations of Massachusetts law.

They were dismissed by the district court for lack of pendent jurisdiction on the authority of *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

■ Our approach to Count I is different from that of the district court. We start our analysis by assuming that FNB was the agent of the Bank.[7] The core issue, as we see it, is whether plaintiffs have stated a cause of action for a violation of 12 U.S.C. § 1972 by the Bank.

The legislative history of this statute reveals that it was aimed at preventing the use of the economic power of a bank to lessen competition or engage in unfair competitive practices. S.Rep. No. 1084, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Ad.News, pp. 5519, 5535. It is specifically stated: "The committee does not intend, however, that the provision interfere with the conduct of appropriate traditional banking practices." *Id.* The purpose of the tying provision "is to prohibit anti-competitive practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service they desire." *Id.*

(A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;

(B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company;

(C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service;

(D) that the customer provide some additional credit, property, or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company; or

(E) that the customer shall not obtain some other credit, property, or service from a competitor of such bank, a bank holding company of such bank, or any subsidiary of such bank holding company, other than a condition or requirement that such bank

shall reasonably impose in a credit transaction to assure the soundness of the credit.

6.  § 92a. Trust powers—Authority of Comptroller of the Currency.

(a) The Comptroller of the Currency shall be authorized and empowered to grant by special permit to national banks applying therefor, when not in contravention of State or local law, the right to act as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, committee of estates of lunatics, or in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located.

7.  We intimate no ruling on whether or not summary judgment should have been granted for defendants on plaintiffs' claim that FNB was an agent of the Bank.

The two cases that have considered alleged violations of 12 U.S.C. § 1972 are in agreement that the tying arrangements prohibited are those that require bank customers to accept or provide other services or products or refrain from dealing with other parties. *Duryea v. Third Northwestern Nat'l Bank*, 606 F.2d 822, 825 (8th Cir. 1979); *Swerdloff v. Miami Nat'l Bank*, 584 F.2d 54, 58 (5th Cir. 1978). *See also Costner v. Blount Nat'l Bank*, 578 F.2d 1192 (6th Cir. 1978).

So also, it has been held that the tying prohibitions do not interfere with the conduct of appropriate traditional banking practices. *McCoy v. Franklin Savings Ass'n & Mortgage Management Co.*, 636 F.2d 172 (9th Cir. 1980); *Clark v. United Bank of Denver Nat'l Ass'n*, 480 F.2d 235, 238 (10th Cir. 1973). In *Sterling Coal Co. v. United Am. Bank*, 470 F.Supp. 964, 965 (E.D.Tenn. 1979), the court held: "The Act does not prohibit attempts by banks to protect their investments." The court ruled specifically that conditioning the grant and extension of credit on the requirement that the bank supervise and control the plaintiff's checking account and other corporate affairs, including veto power over purchases and payments of dividends, was not prohibited by the Act. *Id.*

Plaintiffs argue that the forced hiring of Horvitt was in violation of 12 U.S.C. § 1972(1)(C), which forbids the extension of credit on the requirement "that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service[.]"[8] We are hard put to find any tie-in, let alone one which is prohibited. There is nothing in the pleadings, affidavits, and depositions filed indicating that Horvitt had any financial connection with either the Bank or FNB. Although we can understand how Horvitt might have provided additional security, in the form of management control, to the Bank, this does not

come within the ambit of "additional credit, property or service" no matter how broadly those terms are construed. We add that in addition to there being no tie-in alleged or proved, in any event, the arrangement complained of falls within the range of appropriate traditional banking practices permissible under the Act.

Plaintiffs' pleadings have a Faustian ring; in return for credit, they delivered themselves into the hands of the Bank, and it insisted that its investment be protected by installing the devil Horvitt to run their company when it got into financial difficulty. Horvitt may have done everything plaintiffs allege, and the Bank may have instructed him to do so, but this was done in order to protect the Bank's investment. It is possible that some of the specific practices directed by Horvitt may have been tortious as to BC,[9] but since his retention constituted legitimate bank practice, such actions do not implicate any prohibited tying arrangements. We rule that plaintiffs have failed to state a cause of action for violation of 12 U.S.C. § 1972.

■ Our ruling that the pleadings do not admit of a claim that the actions of the Bank or FNB were intended to or resulted in the lessening of competition or encouraging unfair competitive practices also disposes of Count II. This count was properly dismissed by the district court for failure to state a cause of action. For a tying arrangement to violate the Sherman Act, it must, to some extent, have the effect of restraining free competition in the market for the tied product. *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Here, there were no facts alleged which indicated any restraint of competition in the market for services such as Horvitt provided, even if such a market exists.

Nor can we see how Horvitt's hiring had any effect on competition in the recreation-

---

8. For some reason, plaintiffs in their brief at 31 have substituted numbers for the alphabetical listings used in the statute.

9. We express no opinion on whether plaintiffs have stated a cause of action under Massachusetts law.

al goods market, except, of course, that the demise of BC, which plaintiffs attribute to Horvitt's management, decreased the number of companies in that field by one. There is nothing in the material filed by plaintiffs alleging or suggesting that the Bank forced BC to hire Horvitt so that the business posture of a competitor or competitors of BC would be strengthened at BC's expense. And there is nothing suggesting that the Bank or FNB had any interest, direct or indirect, in such a competitor. The observations we made in *A.D.M. Corp. v. Sigma Instruments, Inc.*, 628 F.2d 753, 754 (1st Cir. 1980), are pertinent:

> While it is not inconceivable that "mere" unfair business practices, or business torts, could in the proper situation constitute an antitrust violation, *see George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 560 (1st Cir. 1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975), the transmutation of these state law torts into federal antitrust violations would have to be based upon a finding that the injuries for which compensation is sought have an unreasonable effect on *competition*, as well as on a particular competitor. *See* III P. Areeda & D. Turner, Antitrust Law ¶ 737 (1978).

■ The gravamen of Count IV is contained in paragraph 50 of the complaint: The defendant Bank violated Title 12, U.S.C., Section 92A; that it did not receive a permit from the Comptroller to take on a fiduciary capacity with a separate corporation; that the Bank not only unlawfully assumed a fiduciary duty, but it breached that duty as well. We must assume that plaintiffs were referring to section 92a(a), *see* footnote 6, *supra*, because it is only this section that autho-

rizes the Comptroller of the Currency to permit national banks to act in a fiduciary capacity. As the district court pointed out, the purpose of this statute is to allow national banks to compete on an equal footing with state banks as fiduciaries. Our analysis again assumes that the Bank acted through FNB. It is difficult to discern a fiduciary relationship between the Bank and any of the plaintiffs. In paragraph 49 of the complaint it is asserted that the defendants "had a fiduciary duty to promote the interest of the plaintiff BCRI and that this duty was breached by actions which promoted the interests and accumlated [*sic*] debt to the Bank at the detriment and disadvantage of the plaintiffs." The scope of "fiduciary" is specified in the statute; national banks may be granted

> the right to act as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, committee of estates of lunatics, or in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located.

12 U.S.C. § 92a(a). It would indeed be stretching the definition of fiduciary to hold that a bank, by lending money on a factors lien agreement, owes a fiduciary duty to the borrower. The pleadings and other material filed do not allege any facts indicating that there was a fiduciary relationship between the Bank or FNB and BC, and therefore defendants were entitled to summary judgment as a matter of law. Fed.R. Civ.P. 56(c).[10]

We affirm the district court's dismissal of Count VIII. This count was only a conclu-

---

**10.** The question of whether or not plaintiffs have standing to sue as to this claim is not without difficulty. Although it is doubtful that plaintiffs could meet the test of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the predecessor statute of 12 U.S.C. § 93, which prescribed the actions that the Comptroller could take for violations of the National Bank Act, was construed by the Supreme court to give a private cause of action to a stockholder who suffered injury by relying on

false bank reports. *Chesbrough v. Woodward*, 244 U.S. 72, 76–77, 37 S.Ct. 579, 581–82, 61 L.Ed. 1000 (1916). In *Harmsen v. Smith*, 542 F.2d 496 (9th Cir. 1976), the Ninth Circuit relied on *Chesbrough* to rule that 12 U.S.C. § 93, which sets forth the procedures, penalties and remedies available to the Comptroller of the Currency for violations of the National Bank Act, including § 92a(a), can also be the basis for a private right of action. *See also Seiden v. Butcher*, 443 F.Supp. 384 (S.D.N.Y.1978).

sory summary of Counts I and II and stated no separate cause of action.

Finally, we turn to the pendent state claims. "It has consistently been recognized that pendent jurisdiction is a doctrine of discretion not of plaintiff's right." *United Mine Workers v. Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139; *see Landrigan v. City of Warwick*, 628 F.2d 736, 748 (1st Cir. 1980). Plaintiffs made a deliberate, if not very well reasoned, choice to proceed in federal court. They have been unable to cross the federal threshold. The district court did not abuse its discretion in dismissing the pendent jurisdiction claims.

*Affirmed.*