Matthew J. (Jerry) PAPPAS, Edna Pappas and Tobacco USA, Inc., Plaintiffs,

v.

NCNB NATIONAL BANK OF NORTH CAROLINA, Defendant.

No. C–84–1240–G.

United States District Court,
M.D. North Carolina,
Greensboro Division.

Feb. 5, 1987.

David M. Clark, Greensboro, N.C., for plaintiffs.

George V. Hanna, III and Robert A. Izard, Jr., Charlotte, N.C., for defendant.

## MEMORANDUM OPINION

ERWIN, District Judge.

This matter is before the court upon defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The court heard argument on October 30, 1986. All motions have been briefed and are now ready for a ruling.

### I. *Facts*

The individual plaintiffs Matthew and Edna Pappas own and operate the corporate plaintiff Tobacco USA, Inc. In 1980 and 1981, the plaintiffs entered into a series of loan transactions with the defendant NCNB National Bank of North Carolina (Bank). In connection with the loans at

issue, plaintiffs signed three promissory notes. The first note executed by Tobacco USA represented a line of credit up to a maximum of $100,000. This note provided that the Bank calculate the interest rate at "NCNB Prime" plus one-half percent and for annual review of the line of credit. The plaintiff corporation executed a second note in May 1981 in the principal amount of $25,000. The Bank calculated the rate of interest at the rate of "NCCNB Prime" plus one and one-half percent. Mr. and Mrs. Pappas signed a third note for the principal amount of $390,000. The Bank calculated interest on this note at the interest rate of the second note. At the same time Tobacco USA received the line of credit, the plaintiffs moved their deposit accounts to the Bank.

When the interest rates and inflation rate increased, the plaintiffs' business began to deteriorate. Plaintiffs began to overdraw their accounts. They failed to make scheduled principal and interest payments on the notes and the line of credit. Although the Bank allowed the plaintiffs to defer payments, the Bank never requested full payment or accelerated the outstanding loans. In 1981, the plaintiffs and the defendant agreed to a modification of the Tobacco USA line of credit on the first note. The agreement required the corporation to maintain available balances or pay a fee on the shortfall. In 1983, the plaintiffs terminated their business relationship with the Bank.

The plaintiffs allege that the defendant North Carolina National Bank violated the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961 *et seq.* (1984); Section One of the Sherman Antitrust Act, 15 U.S.C. § 1 (1973); and the anti-tying and usury provisions of the Bank Holding Act, 12 U.S.C. §§ 1972 and 85 (1986). Also, the plaintiffs allege that the defendant committed common law fraud, usury, mistake, and violated N.C.Gen.Stat. § 75–1.1 (1975).

To sustain a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, the movant must demonstrate that there is no genuine issue as to any material fact. *Phoenix Savings and Loan Inc. v. Aetna Casualty & Surety*, 381 F.2d 245 (4th Cir.1967). This standard is strict, and any doubts as to the genuine issue of any material facts are to be resolved against the movant. *Adickes v. S.H. Kress Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party. *Celotex Corp. v. Catrett*, —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant is entitled to summary judgment if the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. *Federal Claims*

### A. *Claims Arising Out of RICO*

The RICO Act targets "racketeering activity." It defines "racketeering activity" as any "chargeable act" under several generically described state criminal laws, any act indictable under various specific federal criminal laws, including mail and wire fraud. 18 U.S.C. § 1961(1). Section 1962 proscribes the acquisition, maintenance, conduct, or participation in an enterprise which derives or uses income from a "pattern of racketeering activity." Section 1964 provides a forum for civil suits and treble damages. *Sedima, S.P.R.L. v. Imrex*, 473 U.S. 479, 105 S.Ct. 3275, 3278, 87 L.Ed.2d 346 (1986). Plaintiffs' complaint rests on two separate theories for recovery under the RICO Act. First, plaintiffs allege that the Bank violated the RICO Act by misrepresenting the prime rate to the plaintiffs and collecting interest in excessive payments. The plaintiffs claim that the Bank facilitated this scheme by committing mail fraud. Second, the plaintiffs contend that the Bank committed acts of extortion when the plaintiffs signed a new letter of credit agreement.

In order to establish a RICO violation, the plaintiffs must prove: (1) the defendant (a person defined in 18 U.S.C. § 1961(3));

(2) through the commission of two or more acts; (3) constituting a "pattern"; (4) of racketeering activity; (5) directly or indirectly invests in, or maintains an interest in, or participates; (6) in an enterprise; (7) the activities of which affect interstate commerce; and (8) result in injury to the plaintiff's business or property by reason of violation of Section 1962. *Moss v. Morgan Stanley*, 719 F.2d 5 (2nd Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

■ The Bank argues that the plaintiffs' complaint is not sufficient to prove a RICO violation. The Bank contends that the Bank and its parent holding corporation do not constitute a distinct person and enterprise under the requirements of 18 U.S.C. § 1962. North Carolina National Bank Corporation is a holding company which owns North Carolina National Bank and its affiliates. The general rule is that the enterprise and the person must be separate and distinct entities. *United States v. Computer Sciences*, 689 F.2d 1181, 1190 (4th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). Courts use a case by case analysis to determine if two organizations are separate.

The Bank alleges that the parent holding corporation and the Bank do not satisfy the RICO Act requirements even though they are two separate legal entities. At the time the parties signed the loan contract, the parent holding corporation owned the majority of the Bank's stock. The Bank relies on two cases, *Satellite Financial Planning Corp. v. First National Bank of Wilmington*, 633 F.Supp. 386 (D.Del.1986), and the *Computer Sciences* case. These cases involve respectively an unincorporated division and a wholly owned subsidiary. However, the Bank and its parent holding corporation are two separate legal entities. If the Bank and its parent holding corporation are never distinct by virtue of its legal structure, then it creates a *de facto* exemption for banks and their holding companies under the RICO Act. If Congress had intended to exempt banks and their holding

companies from the Act, it would have provided such an exemption.

Also, the Bank relies on the *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). In that case, the Supreme Court held that for the purposes of Sherman Antitrust Act, wholly owned subsidiaries are not distinct from the parent corporation. The *Copperweld* analysis is inapplicable in the RICO Act context. First, The Sherman Antitrust Act focuses on anti-competitive behavior which results in monopolistic industry. Second, the RICO Act focuses on the profits from organized crime. Congress developed RICO to supplement old remedies and develop new methods for fighting crime. *Sedima*, 473 U.S. at ——, 105 S.Ct. at 3286.

The *Copperweld* holding does not extend to RICO's provisions in 18 U.S.C. § 1962(c) primarily because the Sherman Act is premised, as RICO is not, on the "basic distinction between concerted and independent action." Therefore, the policy considerations discussed in *Copperweld* do not apply to RICO, which is targeted primarily at the profits from patterns of racketeering activity. *Haroco v. American National Bank & Trust Co.*, 747 F.2d 384, 403 n. 22 (7th Cir.1984), *aff'd* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Thus, the parent holding corporation and the Bank are separate and distinct for the purposes of the RICO Act.

■ The plaintiffs must prove the defendant conducted a pattern of racketeering activity on behalf of the enterprise. The Supreme Court affirmed the Seventh Circuit's holding that it is "virtually self-evident that a subsidiary acts on behalf of, and thus conducts the affairs of, its parent corporation." *Id.* at 402–03. The plaintiffs argue that the Bank conducted the affairs of its parent holding corporation. North Carolina National Bank Corporation is a holding corporation which provides various financial services. It owns the subsidiary Bank which provides banking and lending services to the public. The Bank manages

those services for the parent holding corporation. This type of relationship is sufficient to prove that the Bank conducted the parent corporation's affairs. The Racketeer Influenced and Corrupt Organizations Act does not require that a defendant participate in the management or operation of the enterprise, but, rather, requires only that the defendant participate directly or indirectly in the conduct of the enterprise's affairs. *Bank of America National Trust & Saving Association v. Touche Ross & Co.*, 782 F.2d 966 (11th Cir.1986). Thus, the Bank conducted the affairs of its parent holding corporation.

However, the plaintiffs fail to satisfy the other elements of the RICO cause of action. They cannot establish the elements of mail fraud and extortion. In order to prevail under the RICO Act, plaintiffs must prove the underlying acts which constitute a "pattern of racketeering activity." 18 U.S.C. § 1961(5). Plaintiffs' first RICO claim is predicated on the Bank's use of the mails in furtherance of the alleged scheme to defraud plaintiffs by overstating the prime interest rate. The second claim is predicated on the allegation of extortion arising from the modification of the interest rate.

1. *Mail Fraud Claim.* The essential elements of mail fraud are (1) a scheme to defraud or obtain money or property by false pretenses, and (2) the use of the mails in furtherance of that scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). In order to satisfy the first element of mail fraud, the plaintiffs must prove common law fraud. The elements of common law fraud are (1) the defendant made a representation relating to some past or existing fact, (2) the representation was false, (3) the defendant knew the representation was false when it was made or made it recklessly, (4) the defendant made a false representation with the intention it should be relied upon by the plaintiffs, and (5) plaintiffs relied upon the representation. *Brickell v. Collins*, 44 N.C.App. 707, 262 S.E.2d 387 (1980).

The plaintiffs allege that the Bank misrepresented the prime interest rate by sending out monthly statements which overstated its prime rate. The plaintiffs argue that the alleged fraud occurred when the Bank failed to explain the definition of the prime rate to plaintiffs and to correct plaintiffs' misunderstandings. The facts indicate that the parties never discussed the meaning of the words, "prime rate," as they were used in the loan agreement. Plaintiffs equate the Bank's best rate with its prime rate. In his deposition, Mr. Pappas admitted that he had never discussed the meaning of the term "prime rate" with Mr. Hamilton, the Bank's lending officer responsible for plaintiffs' account. There is no allegation from the plaintiffs that the Bank made an affirmative representation to the plaintiffs about the level of the Bank's prime interest rate.

Mr. Pappas assumed that the prime rate he received was the prime rate charged to the Bank's most creditworthy customers plus one or two percentage points. This assumption does not constitute a material misrepresentation. Mr. Pappas has been in business for over twenty years. If Mr. Pappas did not understand the meaning of prime rate as used by the Bank, he should have inquired about the Bank's definition. Without attempting to clear up the misunderstanding in his own mind, he relied on his own definition to the plaintiffs' detriment.

Furthermore, plaintiffs allege that the Bank owed a duty to Mr. Pappas to disclose the prime rate definition. To establish a claim of fraud arising out of defendant's failure to disclose material information, plaintiffs must establish that the defendant had a duty to make such a disclosure. *Griffin v. Wheeler-Leonard Corporation & Co.*, 290 N.C. 185, 225 S.E.2d 557 (1976). The duty to disclose arises only when a fiduciary relationship exists between plaintiff and defendant. *Link v. Link*, 278 N.C. 181, 179 S.E.2d 697 (1971). No fiduciary relationship existed between the parties. At the time the plaintiffs wanted a definition of the prime rate, they were negotiating a contract to borrow money. This does

not lend itself to the type of close relationship that the rule encompasses. The contract to lend and to borrow was at arm's length. "A fiduciary duty arises only when the evidence establishes that the party providing financing to a corporation completely dominates and controls its affairs." *Edwards v. Northwestern Bank,* 39 N.C.App. 261, 277, 250 S.E.2d 651, 662 (1979). The plaintiffs were free to seek financial assistance from other banks. Absent an inquiry, the Bank did not owe a duty to the plaintiffs to disclose its definition of the prime rate.

Plaintiffs rely on *Kleiner v. First National Bank of Atlanta,* 526 F.Supp. 1019 (N.D.Ga.1981), *overruled on other grounds sub. nom., Morosani v. First National Bank of Atlanta,* 703 F.2d 1220 (11th Cir.1983), for the authority that the Bank committed mail fraud when it sent out its loan payment charges. In the *Kleiner* case, the Bank of Atlanta included the definition of prime rate on the note. However, the Pappas and Tobacco USA notes do not include the definition of the prime rate. Mr. Pappas had nothing to rely upon to his detriment. The Bank did not make a false representation, and Pappas mistakenly relied on his own definition of the prime rate. These facts alone do not give rise to a fraud allegation. Thus, the plaintiffs fail to establish the state based common law fraud claim, and the mail fraud claim fails as well.

Even if plaintiffs could prove common law fraud, they must establish the existence of a scheme to defraud the plaintiffs. There must be a sufficient nexus between the scheme to defraud and the use of the mails. *Dan River, Inc. v. Icahn,* 701 F.2d 278 (4th Cir.1983). Without the proof of intent to defraud, the plaintiffs fail to satisfy the mail fraud elements. "The mails must be used for the purpose of executing such fraudulent scheme or artifice." *United States v. Maze,* 414 U.S. 395, 405, 94 S.Ct. 645, 651, 38 L.Ed.2d 603 (1974).

2. *Extortion Claim.* The plaintiffs' second claim under the RICO Act is based on an allegation of extortion. Plaintiffs claim the Bank induced Mr. Pappas to sign a new agreement by giving the impression that the Bank would call in his loans. Mr. Pappas claims he signed the new agreement because he feared that the Bank would call in all of plaintiffs' loans and foreclose on all of plaintiffs' property.

Extortion is "the obtaining of property from another with his consent, induced by wrongful use of actual or threatened force, violence, fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (1973). Plaintiffs must show that the Bank obtained property from them by causing them to fear financial and economic loss if they did not surrender such property, and that their fear was reasonable under the circumstances. *United States v. Iozzi,* 420 F.2d 512 (4th Cir.1970), *cert. denied,* 402 U.S. 943, 91 S.Ct. 1607, 29 L.Ed.2d 111 (1973).

In his deposition, Mr. Pappas stated that Mr. Hamilton did not threaten him to sign the new agreement. The Bank did not demand payment on the outstanding loans or threaten the plaintiffs with bankruptcy or foreclosure. Furthermore, Mr. Pappas testified that he did not know why the Bank did not take such action in view of the fact that both he and Tobacco USA were behind in their loan payments and had overdrawn their respective checking accounts on several occasions. Mr. Pappas admits that the plaintiffs never parted with any property as a result of their signing of the new credit agreement. The Bank did not pressure or threaten to induce economic loss if Mr. Pappas did not sign the new credit agreement.

Also, the RICO Act requires proof of at least two acts of racketeering. 18 U.S.C. § 1961(5). The plaintiffs only allege one. They argue that the Bank committed extortion when it required the plaintiffs to increase their corporate and personal loan rate by one percent and maintain "available balances" or incur a "fee" based on the Bank's prime rate. Thus, even if the plaintiffs could prove extortion, they have alleged only one act. Thus, their extortion based RICO claim fails because they cannot prove a pattern of racketeering activity

using extortion. Therefore, plaintiffs' RICO claims must be dismissed.

### B. Claims Arising Out of the Banking Statutes

■ 1. *Anti-competitive Tying Claim.* Plaintiffs claim the Bank violated 12 U.S.C. § 1972 and 15 U.S.C. § 1 when the Bank required the plaintiffs to maintain an available balance or incur a shortfall fee. Section 12 U.S.C. § 1972(1) states: "A bank shall not in any manner extend credit ... on the condition that the customer provide some additional credit, product or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service." Plaintiffs must prove three elements to recover under the anti-tying provision of the Bank Holding Act. First, the plaintiffs must show an anti-competitive tying arrangement. Second, the plaintiffs must show that the banking practice at issue was unusual in the banking industry. Third, the plaintiffs must demonstrate that the practice benefits the bank. *Rae v. Union Bank*, 725 F.2d 478 (6th Cir.1984).

■ In order to prove an anti-competitive tying arrangement, plaintiffs must demonstrate that the Bank tied the extension of credit to any other product, service, or benefit. Plaintiffs allege that the defendant conditioned the further extension of $100,000 line of credit to the plaintiffs on an increase in the interest rate, maintenance of available balances, and payment of a fee based on the Bank's prime rate shortfall. Courts have upheld more intrusive bank conditions than the conditions in the plaintiffs' modified loan agreement. For example, the First Circuit Court of Appeals held that a bank may require a debtor in a precarious financial position to employ a full-time business advisor designated by the bank. *B.C. Recreational Industries v. First National Bank*, 639 F.2d 828, 832 (1st Cir.1981). Similarly, the Tenth Circuit Court of Appeals upheld an arrangement similar to the Pappas contract in *Clark v. United Bank of Denver*, 480 F.2d 235 (10th Cir.), *cert. denied*, 414 U.S. 1004, 94 S.Ct. 360, 38 L.Ed.2d 240 (1973). In that case, the bank required the borrower to maintain interest-free deposits. *Clark*, 480 F.2d at 238.

In this case, the Bank's actions do not constitute a tying arrangement. As in *B.C. Recreational Industries*, the plaintiffs were in a precarious financial condition. The Bank wanted to reduce the risk that the plaintiffs would not be able to make their loan payments on time. Congress did not intend to "interfere with the conduct of appropriate traditional banking practices," and did not intend to prohibit attempts by banks to protect their investment where no anti-competitive practices were involved. *Parsons Steel v. First Alabama Bank of Montgomery*, 679 F.2d 242, 245 (11th Cir.1982).

■ Even if plaintiffs could prove a tying arrangement, they must demonstrate that the banking practice at issue is unusual and that the practice benefits the Bank. In his deposition, Mr. Leeper, plaintiffs' accountant, testified that the conditions in plaintiffs' line of credit were different from the conditions he has seen required of other customers. On the other hand, the plaintiffs' loan officer testified in his deposition that the Bank required some of its other customers to maintain minimum balances or pay a fee in lieu thereof. The maintenance of available balances is not an unusual practice. *Clark.* "A bank's attempt to protect its investment by requiring that a borrower purchase or provide something in conjunction with a loan does not violate 12 U.S.C. § 1972." *Nordic Bank PLC v. Trend Group Ltd.*, 619 F.Supp. 542, 556 (D.C.N.Y.1985).

Plaintiffs cite *Tose v. First Pennsylvania Bank*, 492 F.Supp. 246, (E.D.Pa.1980), *aff'd*, 648 F.2d 879 (3d Cir.1981), for the authority that the Bank's conditions were unusual. In the *Tose* case, the plaintiff alleged that the Pennsylvania bank tied the continuance of a $6,000,000 loan to conditions not usually required of its customer. The Third Circuit Court of Appeals determined that the imposition of financial controls over the Philadelphia Eagles football

organization was directly related to the Pennsylvania bank's protection of its substantial investment. *Tose,* 648 F.2d at 897. The court reasoned that the bank's insistence that the plaintiff relinquish financial control was not unusual in the face of substantial evidence that the bank had good reasons to be troubled about the loan. *Id.* Like the *Tose* plaintiff, the plaintiffs in this case were falling into a precarious financial position. First, the corporation, Tobacco USA, was experiencing difficulties as a result of the recession. Second, plaintiffs were behind on their loan payments and had overdrawn their checking accounts. Because the Bank acted properly in view of the plaintiffs financial condition, the plaintiffs fail to prove that the Bank's conditions were unusual.

Also, plaintiffs fail to demonstrate the Bank benefitted from the conditions. At the time the Bank imposed the conditions, plaintiffs' financial state was worsening. The Bank acted to protect its loans because of the plaintiffs' financial condition. The Bank did not benefit from its actions because the Bank was attempting to prevent further losses from late loan payments and overdrawn checking accounts.

■ Plaintiffs' claim under 15 U.S.C. § 1, the Sherman Antitrust Act, fails because the plaintiffs cannot "demonstrate the requisite market power over the tying product." *Clark,* 480 F.2d at 238. To demonstrate the requisite market power over the tying product, the plaintiffs must show the existence of a tying arrangement benefitting the bank. As previously stated, the plaintiffs failed to prove the existence of a tying arrangement. Absent unique and unusual financing terms which are unavailable from competing financial institutions, a financial institution lending in the commercial money market does not have sufficient economic power to give rise to a claim under the Sherman Act. *United States Steel Corporation v. Fortner Enterprises, Inc.,* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977). Thus, the plaintiffs cannot prevail under 12 U.S.C. § 1972 or 15 U.S.C. § 1.

■ 2. *Usury Claim.* Plaintiffs contend that the Bank committed usury under federal and state law. Title 12, United States Code, Section 85, permits national banks to charge and collect the higher of the permitted rate set out in the statute or the maximum allowed by the state where the national bank is located. The rate of interest that a national bank may charge is a question of federal law and is governed by 12 U.S.C. § 85. *Fisher v. First National Bank of Omaha,* 548 F.2d 255 (8th Cir. 1977). Thus, the federal statute incorporates by reference the state law if the national bank charges the state interest rate.

North Carolina General Statute § 24–1.-1(2) (1981) entitled Contract Rates states: "The parties to a loan ... may contract in writing for the payment of interest not in excess of (2) a rate agreed upon by the parties where the principal amount is more than twenty-five thousand dollars." Pursuant to the statute, the Bank lent the plaintiffs an amount in excess of $25,000 and the plaintiffs could contract at any level of interest they desired. Now, the plaintiffs want to rescind because they feel as if they made a bad bargain. At the time Mr. Pappas signed the new loan agreement, the prime interest rate had risen to approximately twenty percent. The plaintiffs were caught with high interest rates, and the business had not expanded as they had projected. Because the plaintiffs contracted with the Bank for loans over $25,-000, they lack a usury claim because the transaction conforms to the statute's requirements. Because the usury claim fails as a matter of law, plaintiffs are not entitled to a constructive trust of the alleged excess interest paid to the Bank.

■ Even if plaintiffs had a usury claim, they would be barred by the statute of limitations on the amount they could recover. Title 12, United States Code, Section 86 governs the time limit for filing a federal usury claim. It provides that an action for usury must be commenced within two years from the time usurious transactions occurred. 12 U.S.C. § 86 (1945). Both plaintiffs began making interest pay-

ments in 1980. The plaintiffs filed this case on December 27, 1984. Therefore, any payments made before December 27, 1982 are barred because of 12 U.S.C. § 86.

## C. *Claims Arising From State Law*

█ Plaintiffs contend in the alternative that the rate of interest set forth in the loans were not agreed upon, and, therefore, the state statutory rate applies. If the statutory rate applies, then the plaintiffs under the contract would receive the excess interest not barred by the statute of limitations. Section 24–1.1(3) of the North Carolina General Statutes governs the interest rate, which is lower than the contract rate. Application of the statute operates to rescind the contract rate and to impose the statutory rate.

The plaintiffs argue that they are entitled to the lower rate because the term "prime rate" as used by the Bank was vague and indefinite. However, plaintiffs' misinterpretation of that meaning is their own unilateral mistake. The plaintiffs' mistake is unilateral because the Bank did not share plaintiffs' alleged mistake as to the level of "NCNB Prime" in relation to other lending rates. In order for the statutory rate to apply, there must be mutual mistake of fact. A unilateral mistake, without fraud, imposition, undue influence, or like oppressive circumstances, is not sufficient to avoid a contract. *Marriott Financial Services v. Capitol Funds*, 288 N.C. 122, 217 S.E.2d 551, 560 (1975).

The plaintiffs to their own detriment relied on Mr. Pappas' meaning of prime rate, not the Bank's. The plaintiffs should have inquired as to what the Bank meant when it used the words, "prime rate." The Bank was under no obligation or duty to define "prime rate" as the plaintiffs desired. Also, plaintiffs allege that the Bank breached the loan contract when it charged an alleged indefinite or vague interest rate. Plaintiffs are unhappy because they failed to be vigilant when entering the contract. There can be no breach of duty where a contract right does not exist.

Plaintiffs claim that the Bank violated N.C.Gen.Stat. § 75–1.1, the state's Unfair Deceptive and Trade Practices Act. They allege that the Bank violated this Act when it lends below the prime rate or does not set out a specific rate for plaintiffs. First, the Bank did not commit common law fraud. Therefore, the plaintiffs cannot use the fraud allegation to satisfy the requirements of the Act. Second, plaintiffs' claim fails to satisfy the requirements of the statute without the fraud claim. Third, the plaintiffs attempt to use the unfair trade act to reform or avoid what they consider a bad contract. In *United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985 (4th Cir.) *cert. denied*, 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981), the Fourth Circuit Court of Appeals held that a breach of contract, even if intentional, does not fall within the purview of § 75–1.1. Thus, the plaintiffs' cannot prevail under N.C.Gen. Stat. § 75–1.1.

### III. *Conclusion*

The plaintiffs cannot demonstrate that the defendant Bank violated the RICO Act or state law. Although the courts interpret RICO broadly, the plaintiffs must demonstrate a violation in order to survive a summary judgment motion. Plaintiffs' complaint is almost identical to the "prime rate" RICO claim upheld by the *Haroco* decision. However, the plaintiffs failed to show there was a genuine issue as to any material fact as required by Rule 56 of the Federal Rules of Civil Procedure. As required by law, the defendant demonstrated to the court that the plaintiffs' evidence was insufficient to establish an essential element of the plaintiffs' claim. Because the plaintiffs cannot prove the essential elements of the state law claims, the court dismisses the pendent state claims on their merits.

Therefore, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendant North Carolina National Bank's summary judgment motion as to all counts is GRANTED.